GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN 49069)
ChieffoV@gtlaw.com
HEATHER J. SILVER (SBN 285509)
SilverH@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone:  310-586-7700
Facsimile:  310-586-7800

Attorneys for Defendants Katheryn Elizabeth
Hudson p/k/a Katy Perry; Capitol
Records, LLC; and Universal Music Group, Inc.

## UNITED STATED DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| MICHELE RONK,<br><br>              Plaintiff,<br><br>v.<br><br>KATHERYN ELIZABETH HUDSON p/k/a "KATY PERRY"; BRITTANY HAZZARD p/k/a "STARRAH"; FERRAS ALQAISI; OLIVER GOLDSTEIN p/k/a "OLIGEE"; JOSH ABRAHAM; ROBERT MANDELL p/k/a "G KOOP"; CAPITOL RECORDS, LLC; UNIVERSAL MUSIC GROUP, INC.,<br><br>              Defendants. | CASE NO.:  2:20-CV-09843-FLA-AS<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declaration of Heather J. Silver and [Proposed] Order Filed Concurrently]<br><br>Date:      April 9, 2021<br>Time:      1:30 p.m.<br>Place:     Courtroom 6B<br><br>Judge:     Fernando L. Aenlle-Rocha<br>Action Filed:  October 26, 2020 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 9, 2021 at 1:30 p.m., in Courtroom 6B of the above-captioned Court, located at 350 W. 1st St., Los Angeles, CA 90012, Defendants Katheryn Elizabeth Hudson, professionally known as Katy Perry ("Perry"), Capitol Records, LLC ("Capitol"), and Universal Music Group, Inc. ("UMG", and collectively with Perry and Capitol, "Defendants") hereby move the Court for an Order dismissing Plaintiff Michele Ronk's ("Plaintiff" or "Ronk") Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) on the following grounds:

Ronk does not state a claim for relief on her sole claim for copyright infringement because (1) Ronk does not plausibly allege access to the allegedly infringed work by Defendants, an essential element of her copyright infringement claim, because the work was not widely disseminated, and she has not pleaded a plausible chain of events from the allegedly infringed work to Defendants' access thereto, and; (2) Ronk does not plausibly allege the allegedly infringed work and the allegedly infringing work are substantially similar, an essential element of her copyright infringement claim, and the two works are not substantially similar as a matter of law.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Heather J. Silver, all pleadings and files in this action, all matters of which this Court may take judicial notice, and upon such other and further evidence and argument as may be presented to the Court at or before the hearing.

This Motion is made following the conference of counsel pursuant to Civil Local Rule 7-3. The parties conferred on the issues raised in the Motion telephonically, including, without limitation, on March 1, 2021, but were unable to reach a resolution.

Dated: March 8, 2021                          GREENBERG TRAURIG, LLP


                              By:  /s/ Vincent H. Chieffo
                                    Vincent H. Chieffo
                                    Attorneys for Defendants Katheryn Elizabeth
                                    Hudson p/k/a Katy Perry; Capitol Records, LLC;
                                    and Universal Music Group, Inc.

1

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ....................................................................................1

II.   SUMMARY OF FIRST AMENDED COMPLAINT'S ALLEGATIONS ..............3

    A.   Ronk Writes *Upgraded 2.0* ....................................................3

    B.   Plaintiff Suspects Infringement When Perry Releases *Smile*........................4

    C.   Plaintiff's Theory of Access to *Upgraded 2.0.* ...................................6

    D.   Procedural History..................................................................8

III.   LEGAL STANDARD ...............................................................................8

IV.   RONK CANNOT PLAUSIBLY ALLEGE INFRINGEMENT ............................9

    A.   Ronk Does Not Plausibly Allege "Copying" of *Upgraded 2.0* ..................10

        1.   Ronk Does Not Plausibly Allege Access to *Upgraded 2.0* ...............10

            a)   *Upgraded 2.0* Was Not Widely Disseminated .......................10

            b)   Ronk Does Not Plead a Plausible Chain of Events.................12

                (1)   Ronk Speculates How Defendants Could Have Discovered Her Through a Street Sign. .........................13

                (2)   Ronk Speculates That Defendants Could Have Accessed Her Facebook User Data. ..............................14

        2.   Ronk's Other "Probative Evidence" Is Probative of Nothing. ...........16

    B.   Ronk Does Not Plausibly Allege "Unlawful Appropriation" a.k.a. "Substantial Similarity" Between *Smile* and *Upgraded 2.0* .......................18

        1.   Random Shared Words Is Not Substantial Similarity. ......................19

        2.   "Synonyms" and "Shared Sememes" Are Not Protectable. ...............20

        3.   There Is No Substantial Similarity Alleged in the Selection, Coordination, or Arrangement of Elements........................................21

        4.   The Two Songs Tell Different and Unique Stories ...........................24

V.   CONCLUSION........................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   842 F. Supp. 2d 1216 (C.D. Cal. 2012) ...................................................8, 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................8, 18

*Astor-White v. Strong*,
   817 Fed. App'x 502 (9th Cir. 2020) ...........................................................16

*Batts v. Adams*,
   No. CV 10-8123-JWF (RZX), 2011 WL 13217923 (C.D. Cal. Feb. 8,
   2011) ...................................................................................................11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................8

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) .......................................................18, 19, 21

*Briggs v. Blomkamp*,
   70 F. Supp. 3d 1155 (N.D. Cal. 2014).........................................................16

*Briggs v. Cameron*,
   Case No. 20-cv-01596-VC, 2020 WL 6118493 (N.D. Cal. Oct. 16, 2020) .................25

*Carlini v. Paramount Pics. Corp.*,
   Case No. 2:19-cv-08306-SB-RAP, ECF No. 47 (C.D. Cal. Feb. 2, 2021) ..9, 19, 22, 23

*In re Century Aluminum Co. Securities Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ....................................................................8

*Conder v. Home Sav. of Am.*,
   No. CV 077051, 2010 WL 2486765 (C.D. Cal. June 14, 2010) ......................8, 17

*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020) ...................................................................19

*Gray v. Perry*,
   No. 215CV05642CASJCX, 2020 WL 1275221 (C.D. Cal. Mar. 16, 2020)...............17

ACTIVE55570827

*Grosso v. Miramax Film Corp.*,
    383 F.3d 965 (9th Cir. 2004) ...................................................................... 19

*Guity v. Santos*,
    No. 18-CV-10387 (PKC), 2019 WL 6619217 (S.D.N.Y. Dec. 5, 2019) ................... 19

*Hayes v. Keys*,
    No. CV 14-6246-PA (JEMx), 2015 WL12734010 (C.D. Cal Jan. 7, 2015) ........... 9, 12

*Hayes v. Minaj*,
    No. 2:12-CV-07972-SVW-SH, 2012 WL 12887393 (C.D. Cal. Dec. 18,
    2012) .............................................................................................. 12, 16, 18

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) ......................................................................... 16

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...................................................................... 24

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012) ................................................................. 18, 21

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ...................................................................... 3

*Loomis v. Cornish*,
    No. CV 12-5525 RSWL (JEMx), 2013 WL 6044345 (C.D. Cal. Nov. 13,
    2013) ........................................................................................... 10, 11

*Loomis v. Cornish*,
    836 F.3d (9th Cir. 2016) ............................................................................ 14

*Masterson v. The Walt Disney Co.*,
    821 Fed. App'x 779 (9th Cir. 2020) .............................................................. 18

*Meta-Film Assocs., Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984) ............................................................. 15

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ............................................................. 18, 19, 23

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ............................................................ *passim*

iii

*Rodriguez v. Lozano*,
   No. 5:19-cv-02127-GW-JDE, 2020 WL 8084165 (C.D. Cal. Mar. 2, 2020) ................................................................................................9

*Schkeiban v. Cameron*,
   No. CV 12-0636-R, 2012 WL 12895721 (C.D. Cal. July 20, 2012)...........12

*Silas v. HBO, Inc.*,
   201 F. Supp. 3d 1158 (C.D. Cal. 2016) ......................................................22

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) ............................................................*passim*

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) .............................................10, 13, 14, 17

*Towler v. Sayles*,
   76 F.3d 579 (4th Cir. 1996) ........................................................................12

*Weiss v. DreamWorks SKG*,
   No. CV1402890DDPAJWX, 2015 WL 12711658 (C.D. Cal. Feb. 9, 2015) ...................................................................................8, 16, 17

*Whitehead v. Paramount Pictures Corp.*,
   53 F. Supp. 2d 38 (D.D.C. 1999)...........................................................19, 20

*Woods v. Carter*,
   No. 15 C 9877, 2016 WL 640526 (N.D. Cal. Feb. 18, 2016) ...................19

**Rules**

Federal Rules of Civil Procedure, Rule 8 .........................................................8

*ACTIVE55570827*

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.   INTRODUCTION

3

In July 2020, Defendants Katheryn Elizabeth Hudson, professionally known as

4

Katy Perry ("Perry"), Capitol Records, LLC ("Capitol"), Universal Music Group, Inc.

5

("UMG," and collectively with Perry and Capitol, "Defendants"), released the song *Smile*

6

performed and co-written by Perry. *Smile* is an upbeat Pop song that tells the story of

7

Perry being "humble[d]" by "rejection" and not being "my best," recovering on a "long

8

hard road" with an "ego check" and "no shortcuts," and ultimately being "thankful" and

9

"grateful" because she is "2.0 remodeled" and "now I sparkle" and "finally got back that

10

smile," "a Mona Lisa masterpiece."

11

Shortly after *Smile* was released, Plaintiff Michelle Ronk ("Ronk") in Tigard, a

12

small city near Portland, Oregon, read the *Smile* lyrics on Perry's Instagram post and

13

became obsessed with the idea that it was impossible that Perry or anyone else could

14

have written *Smile* without copying the lyrics she had written in 2014 for a song she was

15

hoping to compose entitled *Upgraded 2.0*. Those lyrics tell Ronk's personal and

16

harrowing "Christian redemption" story of living "deep in sin" driven by her belief that

17

her "only strength is by a man's lust" being redeemed and "upgraded (2.0)" by her belief

18

in the "Shepard," Jesus Christ and thus avoiding Jenn's "sad end" testifying that "Jesus,

19

without you, it's me it could have been, Thank You! Amen." In 2014, Ronk posted her

20

lyrics to *Upgraded 2.0* on her private Facebook page, the social media age equivalent of

21

putting a copy in her desk drawer. While self-identifying as a "Songwriter" and

22

"Musician," she admits that those labels are rather aspirational; she has not yet attempted

23

to release "her music to the world" nor "launch her brand" to the music industry, nor

24

"begun to sell and make money from her completed musical compositions" although she

25

hopes to do so "within the next year."

26

The 97-paragraph First Amended Complaint (Doc. No. 65) ("FAC") fails the

27

plausibility test as to both access and infringing substantial similarity and should be

28

dismissed with prejudice. In fact, the FAC merely speculates how (1) Defendants may

1

have accessed and copied Ronk's *Upgraded 2.0 lyrics* on her virtually invisible 2014 private Facebook post, and (2) why *Smile* infringes her lyrics despite the fact that *Smile* tells a different story and only shares, at best, seven random words: "2.0", "not," "myself," "road," "tear," "thankful," and "rejection."

The FAC's efforts to allege access consist of implausible speculation that because Perry's previous *Witness* album was less successful than hoped, Perry and Capitol masterminded a "Plan" to falsely claim that Perry was depressed, so that she could release a new album about overcoming her depression to win back her fans. As part of this "Plan," UMG entered a "strategic partnership" with Facebook's "master of leverage," Mark Zuckerberg (and aided perhaps by a former Netflix and Spotify executive named Troy Carter who is developing cutting-edge "predictive analytics" technology to identify "hit" songs), by which UMG obtained and unlawfully used Facebook's private user data "to access … Ronk's" private 2014 Facebook post of the *Upgraded 2.0* lyrics. The FAC further speculates that Defendants may have known about Ronk because somebody may have seen a small sign in 2016 while driving through Beverly Hills (a sign that only bears a picture of a male evangelical pastor, Ronk's name, and the hashtag #TellOregon); may have attended her 2016 event in Portland to see "her first live performance ever" during which she did *not* sing *Upgraded 2.0*; and, a couple of years later, may have told UMG to use its illegal access to Facebook's user data and "structured SQL search[]" technology to find Ronk's 2014 post.

To bolster that speculation, Ronk offers her "clinical" and "theological and spiritual" opinions that Perry could not have independently created *Smile* because (a) Perry was either not depressed enough or, alternatively, was too depressed to have written *Smile* and (b) the word "God" is part of the *Smile* lyrics, and only a true Christian, like Ronk, could have written about "God," but a supposedly lapsed Christian like Perry "who has chosen to reject God" could only have written about the "Universe."

In any event, the First Amended Complaint does not and cannot change *Upgraded 2.0*'s lyrics, whose coincidental and banal commonalities with *Smile*'s are so few that the

2

works cannot be substantially similar as a matter of law. Ronk downplays, or worse, misrepresents, the demonstrable differences between the two works. She contorts what amounts to four shared words (seven, when you include words with common roots) into tables of what she admits are "unprotectable" shared "ideas" and "story elements," and then declares in conclusory manner that by sharing enough of these "story elements," the works themselves must be substantially similar. Ronk continues to misunderstand the lawful "expression" of commonplace ideas, also newly alleging that she has rights to similar combinations of synonyms, and even similar combinations of *connotations*. Synonyms, "sememes," and basic common words are the fundamental building blocks used to imbue abstract ideas with individualized expression. While *Smile* and *Upgraded 2.0* may pull from similar generic themes at the most abstract level, the two sets of lyrics express those generic themes by telling very different personal stories. The two works are not substantially similar as a matter of law, no amendment can change this fatal defect, and therefore the Amended Complaint should be dismissed with prejudice.

While the FAC is not plausible, it is a prime example an "obsessive conviction, [that is] so common among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984).

## II.    SUMMARY OF FIRST AMENDED COMPLAINT'S ALLEGATIONS

### A.    Ronk Writes *Upgraded 2.0*

"Plaintiff is a singer/songwriter … with a passion for advocating for mental illness support and stigma awareness." FAC ¶ 14. Although she "has not yet launched her brand … [and] has not yet officially begun to sell and make money from her completed musical compositions," Ronk has high hopes for a "flourishing career in the music industry and a return on her creative investment." *Id.* ¶¶ 15, 17. She hopes to "proceed with that launch within the next year." *Id.* ¶ 17.

Ronk alleges that she created a "unique and creative musical composition titled '*Upgraded 2.0*' in 2014, … based on her own life experiences." *Id*. ¶ 18. According to

Ronk, *Upgraded 2.0* reveals her personal story of "enduring a dark and hard beginning, learning lessons, and triumphantly and thankfully becoming a new person through the help of Jesus." *Id.*

On September 23, 2014, Ronk posted *Upgraded 2.0*'s lyrics to her personal Facebook page. *Id.* ¶ 20, Fig. A. In her FAC, Ronk does not allege she shared the lyrics of *Upgraded 2.0* anywhere else nor to have ever shared any video or audio recording of *Upgraded 2.0* at any time. *See generally* FAC.

### B.   Plaintiff Suspects Infringement When Perry Releases *Smile*

On July 10, 2020, Perry, released a single, *Smile*, from her upcoming album of the same name. *Id.* ¶ 41. When Ronk saw the lyrics to *Smile* posted on Perry's Instagram account the next day, July 11, 2020, Ronk says she "was immediately struck with the striking similarity" to the lyrics of *Upgraded 2.0*.[1] *Id.* ¶ 42.

Ronk alleges that following an underwhelming fan response to Perry's previous album, *Witness*, Perry and the CEO of Capitol, "figured out a 'Plan' for Perry," which involved Perry first publicly disclosing "how much she had fallen into deep, clinical depression" "[a]fter the 'Witness' album failure," and then releasing a new album, *Smile*, with songs that "talk about how she got through that depression." *Id.* ¶¶ 36-37. As part of that "Plan" to rescue Perry's career "from [her] previous album's lack of success," Perry allegedly "needed songs whose content and story helped contribute to a believable 'Come Back' story." *Id.* ¶ 43. Perry, however, was "suffering from [a] lack of" creativity, so Defendants "proceeded to deeply search for creative original work of others to meet the needs for her album's song's [*sic*] needed messages," including *Upgraded 2.0*. *Id.*

As supposed "probative evidence" in support of her claim of infringement, the Amended Complaint explains that around the same time "the original version of *Smile* was originally written," for Perry, "things were 'really difficult [with her Depression].'" *Id.* ¶¶ 38-39 (alteration in original). Yet the lyrics of *Smile* were "bright and cheery" and

---

[1] For the Court's convenience, Defendants have re-typed the lyrics to *Upgraded 2.0* and *Smile* as alleged in the FAC and attach them hereto as Addenda A and B, respectively.

did not match Perry's accounts of her depression nor the "medical definition of symptoms of someone suffering with 'clinical' depression." FAC ¶ 64. According to Ronk, it is "factually impossible" for Perry to have written *Smile* because the lyrics could not have "physically … come out" of her while she was having "suicidal thoughts" as "[t]he pain would come out in different words" and therefore "the more plausible explanation is that she, and the writers of *Smile*, actually drew the inspiration and lyrics and protected expression for *Smile*" from *Upgraded 2.0*. *Id.* ¶ 66.

Ronk also newly alleges that *Smile*'s references to God are "highly probative evidence" of copying of Ronk's lyrics, namely the words "Shepherd" or "Jesus," because "Ms. Perry is very vocal about walking away from her Christian upbringing" and "very vocal about searching on her 'spiritual' journey, looking for anything but God." *Id.* ¶ 67. Ronk then asserts that if Perry had truly written *Smile*—and not copied *Upgraded 2.0*— "in reality she would have used 'Universe'." *Id.* ¶ 78(8).

Turning to the alleged similarities between *Upgraded 2.0* and *Smile*, Ronk claims Defendants copied "twelve (12) similar story elements/lyrical phrases" and that even though Defendants "chose different synonyms, or substituted imagery details, at times, to attempt to obscure the similarities in the copied lyrical phrases," the "resulting quantity of probatively similar lyrical phrases, and story elements, even if slightly tweaked by changing synonyms" are "'so striking as to preclude the possibility that Plaintiff and defendant independently arrived at the same result.'" *Id.* ¶ 77.

In addition, the lyrics to *Smile* and *Upgraded 2.0* share many of the "same idea[s]," such as: "I've grown to a new and better version of myself," "I was worse," and "now im [*sic*] better," a "long painful journey," "[l]earning from experiences that made me cry," "feeling extremely thankful," and "inspired to persevere." *Id.* ¶¶ 78(1)-(6). Ronk further alleges *Smile* and *Upgraded* 2.0 share certain individual words, such as "road" and "2.0"; "synonymous words or synonymous phrases"; and even "Sememe[s]" of "Denotational 1 type" or "Connotational 3 type." *Id.* ¶¶ 78(1), (3), 81(2)-(3).  In sum, according to Ronk "the entire theme of [Perry's] *'Smile'* tells the same story [as *Upgraded 2.0*] of life

5

experiences, mistakes, lessons, self reflection, remaking of oneself, and life saving redemption with God's help, and the resulting thankfulness." *Id.* ¶ 75.

### C.   Plaintiff's Theory of Access to *Upgraded 2.0.*

Ronk alleges she has maintained a public website since 2016 where she "showcase[es] [herself] as a Singer, Songwriter, and Mental Illness Advocate." FAC ¶ 21. Ronk alleges *Upgraded 2.0* was "listed" on the website as a song on her upcoming album but does not allege that the lyrics were listed on the website. *Id.* ¶ 22. Ronk also "represents herself and her brand on her website and many social media platforms, including Facebook, Instagram, and Twitter" in her "publicly available bios and social media profiles, in varying forms." *Id.* ¶ 27.

On or around March 2016, Ronk alleges she traveled to the "Los Angeles/Beverly Hills Area" and displayed a small sign near the intersection of Sunset Blvd. and Foothill Rd. *See id.* ¶ 24, Fig. C. The sign allegedly featured a photograph of a "celebrity Christian Evangelist and poet" named Clayton Jennings and displayed Ronk's name in the lower right-hand corner. *Id.*, Fig. B. The sign advertised a free event called "#TellOregon," allegedly organized by Ronk, taking place nearly a thousand miles away in Portland, Oregon, but the sign did not indicate who Michele Ronk was, how she was related to Mr. Jennings, or even that she was a musician. *Id.* Ronk alleges she advertised the event on similar signs in counties surrounding the Portland metropolitan area. *Id.* The Portland event purportedly "saw several hundred in attendance," and she "opened for the event" in "her first  live performance ever" performing only her song *Be Love*. FAC ¶ 24.

According to Ronk, this is one of the many ways that Defendants could have become aware of Ronk and, therefore, gone on a hunt to track down whether the never-before-published Ronk might have lyrics Perry might want to steal.

Indeed, Ronk maintains, as she did in the former iteration of her complaint, that Facebook provided Defendants illegal access to Ronk's private Facebook data, because Facebook has a "history of leveraging user data for gain," and because Facebook and Defendant UMG announced a general "strategic partnership." (Compl. ¶¶ 38-42; FAC ¶¶

44, 46-49.) Further, Ronk now clarifies in new allegations that "Facebook uses MySQL" "to store all it's [*sic*] user and application data" and that "UMG would easily have been able to write [MySQL] queries to obtain whatever they were looking for in that user data, whether it be data modeling, or trying to spot up and coming talent, or for inspiration, or anything else." FAC ¶¶ 50, 54. Ronk alleges that "since [she] is clearly listed in her Facebook bio as 'Recording Artist,' and as 'Songwriter,'" a "structured SQL query" could "get all users who are recording artists," so Defendants "would just need to query her posts" "to find what they are looking for." *Id.* ¶ 55.

In purported support of the alleged nefarious nature of UMG's partnership with Facebook, Ronk now points to the fact that, on February 8, 2021, well after *Smile* was released, UMG and social media giant TikTok supposedly announced a partnership "that also includes user data access which is also being used to spot and surface potential hit songs and artists from TikTok's user data." FAC ¶ 45. "Under the Agreement, [TikTok] has pledged to work with the UMG to build new features including A&R insights and models that will presumably help to identify songs and artists poised to break out." *Id.*

Further elaborating on the scheme to access *Upgraded 2.0*, Ronk alleges Defendants had help from a man named Troy Carter, with whom "Defendants Capitol and UMG have been partnered" since 2013. FAC ¶ 59. Carter, who allegedly employs former Facebook and UMG executives, "has begun to . . . develop[] predictive analysis Artificial Intelligence software" "that helps identify and spot songs or artists that have 'hit' potential," one example being his "StreamRate" software, which has the "ability to surface valuable individual data from large data sets." *Id.* ¶¶ 59-60, 62. According to Ronk, "Capitol and UMG were able to use [Carter's] Predictive Analysis AI software," in combination with the "user data from Facebook, to surface potential hit songs posted to [F]acebook, just like they are doing with their brand new partnership with Facebook." *Id.* ¶¶ 61, 63. "[I]n the case of Plaintiff's song, *Upgraded 2.0*, Defendants[] used the technology to infringe." *Id.* ¶ 63.

### D.   **Procedural History**

On October 26, 2020, Ronk filed the instant lawsuit asserting copyright infringement, contributory or vicarious copyright infringement, and unfair competition. *See generally* Doc No. 1. After Defendants moved to dismiss the Complaint on December 30, 2020, the Court granted the motion with leave to amend on grounds that Ronk had not adequately alleged the copyright registration prerequisite of her lawsuit. Doc. Nos. 27, 63. Ronk filed her FAC on February 22, 2021, alleging only a single claim against all defendants for direct copyright infringement. *See generally* FAC. The FAC now alleges she obtained a valid registration for *Upgraded 2.0. Id.* ¶ 89.

## III.   **LEGAL STANDARD**

Under Rule 8, a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007).[2] "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Plaintiff cannot rely on "threadbare recitals of the elements of a cause of action" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Conder v. Home Sav. of Am.*, No. CV 077051 AGCT, 2010 WL 2486765, at *2 (C.D. Cal. June 14, 2010). Further, allegations "equally consistent with non-culpable behavior" do not plausibly state a claim for relief. *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1226 (C.D. Cal. 2012) (citing *Twombly*, 550 U.S. at 557). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible" to survive a motion to dismiss. *In re Century Aluminum Co. Securities Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Finally, and key here, "[t]he Ninth Circuit has long held that 'when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'" *Weiss v. DreamWorks SKG*, No. CV1402890DDPAJWX, 2015 WL

---

[2] All internal citations are omitted, and all emphases are added unless otherwise noted.

1   12711658, at *4 (C.D. Cal. Feb. 9, 2015) (quoting *Christianson v. West Pub. Co.*, 149

2   F.2d 202, 203 (9th Cir. 1945)).

3   **IV.   RONK CANNOT PLAUSIBLY ALLEGE INFRINGEMENT**

4          To state a claim for copyright infringement, Ronk must plausibly allege

5   (1) ownership of a valid copyright, and that (2) Defendants copied protected aspects of

6   her copyrighted work. *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116-17 (9th Cir.

7   2018), *overruled on other grounds, Skidmore v. Led Zepplin,* 952 F.3d 1051 (9th Cir.

8   2020). "The second prong of the infringement analysis contains two separate

9   components: 'copying' and 'unlawful appropriation.'" *Skidmore*, 952 F.3d at 1064.

10          With regard to the "copying" element, "[i]n the absence of direct evidence of

11   copying…, the plaintiff 'can attempt to prove it circumstantially by showing that the

12   defendant had access to the plaintiff's work and that the two works share similarities

13   probative of copying.'" *Id.* "[I]ndependent creation of a similar work cannot give rise to

14   liability." *Carlini v. Paramount Pics. Corp.*, Case No. 2:19-cv-08306-SB-RAP, ECF No.

15   47, at 10 (C.D. Cal. Feb. 2, 2021).[3] As to "unlawful appropriation," its "hallmark … is

16   that the works share *substantial* similarities." *Skidmore*, 952 F.3d at 1064 (emphasis in

17   original); *see Hates v. Keyes*, No. CV 14-6246-PA (JEMX), 2015 WL 12734010, at *2

18   (C.D. Cal. Jan. 7, 2015) (plaintiff must allege "infringer had access to [her] copyrighted

19   work and that the works at issue are substantially similar in their protected elements").

20          The FAC falls short on all counts. Among other things, Ronk does not and cannot

21   allege a plausible theory by which Defendants obtained access to her private Facebook

22   page to view *Upgraded 2.0*'s lyrics. Further, *Smile* and *Upgraded 2.0* are, as a matter of

23   law, not substantially similar. These infirmities cannot be cured by amendment, and thus

24   the FAC should be dismissed without leave to amend.

25

26

---

27   [3] "[I]t is unnecessary . . . to request judicial notice of legal authority." *Rodriguez v. Lozano*, No. 5:19-cv-02127-GW-JDE, 2020 WL 8084165, at *1 n.1 (C.D. Cal. Mar. 2,

28   2020).

**A.    Ronk Does Not Plausibly Allege "Copying" of _Upgraded 2.0_**

Ronk does not claim to have direct evidence of copying. *See generally* FAC. Therefore, she must show both Defendants' access to *Upgraded 2.0*, and that *Smile* and *Upgraded 2.0* share sufficient similarities to preclude independent creation of *Smile*. *Skidmore*, 952 F.3d at 1064. Ronk's inability to plead a plausible, non-speculative theory of access is fatal to her claim and demands dismissal. Further, as discussed *infra* Section IV.B., the two songs share so little in common that Ronk certainly cannot preclude independent creation of *Smile*.

**1.    Ronk Does Not Plausibly Allege Access to _Upgraded 2.0_**

To establish access, a plaintiff must show "a reasonable possibility, not merely a bare possibility that an alleged infringer had the chance to view the protected work." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). Access cannot be inferred through "mere speculation or conjecture." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000), *overruled on other grounds by Skidmore*, 952 F.3d 1051. Absent direct evidence of copying, access is generally established in one of two ways: (1) "the plaintiff's work has been widely disseminated," or (2) "a particular chain of events … between the plaintiff's work and the defendant's access to that work." *Id.* at 482. Because the lyrics to *Upgraded 2.0* were not widely disseminated and Ronk cannot allege a plausible chain of events linking *Upgraded 2.0* and any defendant's access thereto, Ronk has not and cannot adequately plead access.

a)    _Upgraded 2.0_ Was Not Widely Disseminated

Ronk admits the lyrics to *Upgraded 2.0* were not widely disseminated, alleging only that she allegedly "shared her copyrighted work, in the form of lyrics to the song, '*Upgraded 2.0,*' to her Facebook page on September 23rd 2014." FAC ¶ 20. Ronk does not allege she shared the lyrics to *Upgraded 2.0* anywhere else or that the work was distributed in any other form at any other time. *See generally* FAC. Yet, "the public dissemination necessary to infer that a defendant might have had access to the work is considerable." *Loomis v. Cornish*, No. CV 12-5525 RSWL JEMX, 2013 WL 6044345, at

10

*10 (C.D. Cal. Nov. 13, 2013), *aff'd, Loomis, supra*, 836 F.3d 991 (9th Cir. 2016). "[F]or a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the market." *Id.* at *10. The song *Upgraded 2.0* has achieved no commercial success and is not available anywhere. *See* FAC ¶ 17 ("[Ronk] has not yet launched her brand …, [and] has not yet officially begun to sell and make money from her completed musical compositions."). Indeed, Ronk admits *Upgraded 2.0* "has not yet seen it's [*sic*] first publication." Doc. No. 40 at 22.

Posting *Upgraded 2.0*'s lyrics to Ronk's private Facebook page is insufficient as a matter of law to constitute the requisite widespread dissemination. Even were her post accessible to the public, "[t]he availability of a copyrighted work on the Internet, in and of itself, is insufficient to show access through widespread dissemination." *Loomis*, 2013 WL 6044345, at *12. Indeed, "the posting of videos and/or songs on YouTube, Amazon.com, and iTunes by an unknown singer" is "quite limited" dissemination that is "clearly insufficient to support a finding of access." *Batts v. Adams*, No. CV 10-8123-JWF (RZX), 2011 WL 13217923, at *4 (C.D. Cal. Feb. 8, 2011). Not only does Ronk not allege the lyrics were posted to a publicly accessible site, [4] Ronk does not even allege any defendant follows the private Facebook page where the lyrics were posted.

Nor do Ronk's new allegations that she performed a different song at a local event or that she has generally promoted *herself* on her own public website and on social media change the conclusion that access has not been alleged. *See* FAC ¶¶ 21-22, 27. Even if Ronk had plausibly alleged any defendant knew or had ever heard of Ronk (she does not, *infra* Section IV(A)(1)(b)(1)), it is "the plaintiff's *work*," *Upgraded 2.0*, that must be widely disseminated—not Ronk. *Loomis*, 2013 WL 6044345, at *10. In any event, Ronk acknowledges her public website only mentions the *title* of *Upgraded 2.0* (to be released

---

[4] Even when the Ninth Circuit suggested in dicta in *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1068 (9th Cir. 2020) that "the concept of 'access'" may be "increasingly diluted in our digitally connected world," it nonetheless acknowledged that, to allege such online access, the allegedly infringed work must, at minimum, be "available on demand."

on a future album)—not its lyrics. *Id.* ¶ 22. The only place Ronk posted her *lyrics* to *Upgraded 2.0* was her private Facebook page. *Id.* ¶ 20.[5]

Accordingly, Ronk has not pleaded the "widespread dissemination" of *Upgraded 2.0* necessary to establish access. *See*, *e.g.*, *Keys*, 2015 WL 12734010, at *2-3 (dismissing without leave to amend because plaintiffs' "sole allegation with regard to access [was] that the work was uploaded to YouTube," which was insufficient to "imply it was disseminated widely"); *Hayes v. Minaj*, No. 2:12-CV-07972-SVW-SH, 2012 WL 12887393, at *3 (C.D. Cal. Dec. 18, 2012) (granting motion to dismiss on access grounds because posting song to YouTube did "not imply it was disseminated widely, and the Complaint provide[d] no other facts to support such an inference").

> b) <u>Ronk Does Not Plead a Plausible Chain of Events</u>

Recognizing as she must that her lyrics were not widely disseminated, Ronk falls back on other tortured theories of access, which neither her pleadings nor common sense support. To plausibly plead access under a specific "chain of events" theory, Ronk was required to plead "*facts* showing a chain of events from [the intermediary] to [Defendants] and … [that] their relationship is sufficiently strong to raise a reasonable possibility of access." *Schkeiban v. Cameron*, No. CV 12-0636-R (MANX), 2012 WL 12895721, at *2 (C.D. Cal. July 20, 2012) (granting motion to dismiss because Plaintiff "merely speculates without factual support that [the third-party intermediary] acted as he said") (emphasis added); *cf. Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996) ("A court may infer … a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer," like "she

---

[5] Ronk's allegation that a "spider" "scraped" her blog post in March of 2020 and then "suddenly"—six months later, after she had served her Complaint and had begun corresponding with Defendants' counsel—her blog post was "swarmed with visits, from visitors located exactly where Defendants live" bears on nothing. *See id.* ¶¶ 27, 30. Even if true or in any way connected to Defendants, these allegations only show that Ronk's blog post (which did not contain *Upgraded 2.0*'s lyrics) was "disseminated" to a website scraper of unknown origin *after Smile* was written, (*see id.* ¶ 39), and that the blog was visited *after Smile* was released and after Ronk served her Complaint. *See id.* ¶ 41.

supervises or works in the same department or contributes creative ideas to" the alleged infringer.").

Here, in sum, Ronk alleges that Facebook's "master of leverage," CEO Mark Zuckerberg, exploited music licenses via a "strategic partnership" with Defendant UMG in exchange for an undefined universe of "controversial [Facebook] user data access," "and Defendants used that to access" the *Upgraded 2.0* lyrics on Ronk's private Facebook page, either on their own or perhaps in coordination with Troy Carter, a former Netflix and Spotify executive with his own "predictive analysis Artificial Intelligence software." FAC ¶¶ 46, 60. None of Ronk's rank speculation, however, constitutes "a particular chain of events … between the plaintiff's work and the defendant's access." *Three Boys*, 212 F.3d at 482.

> ### (1)  Ronk Speculates How Defendants Could Have Discovered Her Through a Street Sign.

For the first link in her chain, Ronk attempts to plead how Plaintiffs "*would have been able* to discover" her existence, so that they would then choose to "utilize their other tools, like their social media user data access and predictive analysis AI to find and analyze *Upgraded 2.0*'s lyrics." FAC ¶¶ 57, 58; *see also* ¶¶ 21-28, 54-55. Putting aside the speculation inherent in Ronk positing how something *might have* happened, her allegations are not remotely plausible.

Recall that the FAC alleges that in March 2016, Ronk placed a barely visible sign on Sunset Boulevard in Beverly Hills advertising her event in Portland, Oregon. FAC ¶ 24, Fig. C. In the bottom corner, the sign reads "with Michele Ronk," but does not indicate who "Michele Ronk" is, or even that she is a musician. *Id.*, Fig. B.

While Ronk does not (and cannot) allege who attended the "unticketed" event, (*id.* ¶ 24), the theory appears to be that a Defendant (or one of their agents) (1) saw the sign driving by; (2) could read it; (3) became interested in attending an event nearly a thousand miles away and identified only by a hashtag; (4) heard Ronk perform *Be Love* at the event, and then from that performance (5) searched for and visited Ronk's website;

(6) noticed the title to *Upgraded 2.0* which was set to appear on a yet unreleased album; (7) and decided to use Facebook and/or Troy Carter's technology to illegally search through all of Ronk's social media posts until they (8) found her 2014 Facebook post containing *Upgraded 2.0*'s lyrics. While it is true that "anything is possible," *Three Boys*, 212 F.3d at 482, the chain of inferences required to connect one of the Defendants to *Upgraded 2.0* in this manner is so remote as to strain credulity.[6] *See Loomis v. Cornish*, 836 F.3d at 998 (9th Cir. 2016) ("bare possibility" of reading about Plaintiff in a magazine in a break room of a studio not enough to raise a triable issue of access).

(2)   *Ronk Speculates That Defendants Could Have Accessed Her Facebook User Data.*

Perhaps because there is no reason to believe Defendants happen to be among the few hundred people that attended an event nowhere near the small illegible sign on which she claims the event was advertised in Beverly Hills, Ronk posits that UMG and Facebook's "strategic partnership" must have included illegal access to Facebook's user data, from which Defendants "would [have] be[en] able to [] target[]" Ronk "with a structured SQL query to, for example, 'get all users who are recording artists,'" a search that must have included Ronk in its dragnet. FAC ¶¶ 54-55. From there, UMG "would just need to query her posts" or execute another, narrower search to "get all posts from any user who has songwriter in their bio and which include '©,'" which would encompass Ronk's post containing the *Upgraded 2.0* lyrics.[7] *Id.* ¶ 55.

In other words, Ronk asks the Court to assume that because UMG and Facebook entered into a music licensing agreement and because Facebook has previously leveraged

---

[6] Nor does the fact that Ronk has deep ties in the Christian community; promotes herself as a "Christian," "Songwriter," "Mental Illness Advocate"; or that she has been contacted by "Mental Illness Treatment Centers" and a Christian actress through her social media account more plausibly allege a "chain of events" by which *Defendants* discovered Ronk and elected to unlawfully steal the unknown artist's lyrics. FAC ¶¶ 27-28.

[7] Even assuming UMG conducted the targeted SQL searches as she claims, Ronk's 2014 Facebook Post did not contain a ©, and thus such a search would not have located her lyrics. *See* FAC ¶ 20, Fig. A.

14

its user data in the context of other commercial partnerships, Zuckerberg and Facebook must have provided UMG illegal access to an unknown universe of data that included Ronk's private Facebook page. *Id.* ¶ 49. Yet, the only allegations resembling *facts* that Ronk alleges are that (1) Facebook uses MySQL "to store all it's [*sic*] user and application data"; (2) Facebook has the capacity to conduct SQL queries to retrieve individual Facebook posts; (3) Facebook has "leveraged" its user data in the past (without alleging which data or for what purpose); and (4) UMG entered into a strategic partnership with Facebook. *Id.* ¶¶ 46, 49-50. Despite the explanation of technology possessed by Facebook that might permit a search of its user data, Ronk still fails to move the needle from theoretical to plausible that *Defendants* were permitted unlawful access to private user data and elected to exploit such to illegally hunt down Ronk's lyrics. Even assuming her allegations true, Ronk has only alleged facts "equally consistent with non-culpable behavior," which is insufficient to plausibly state a claim. *Allstate Ins. Co.*, 842 F. Supp. 2d at 1226 (citing *Twombly*, 550 U.S. at 557).

Indeed, Ronk's theory of access remains a "tort[u]ous chain of hypothetical[s]" too attenuated to plausibly allege a "reasonable opportunity to view" Ronk's work. *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984).[8] Ronk's "mere speculation" is "completely unsubstantiated" and thus insufficient as a matter of

---

[8] Ronk additionally alludes to (a) an ongoing relationship between UMG and/or Capitol and an individual software developer, Troy Carter, (FAC ¶ 59), who is allegedly developing software to spot songs with "hit" potential, and (b) another recent press release announcing a music licensing agreement between UMG and social media site TikTok. *Id.* ¶ 45. By her own allegations, Ronk does not yet have a published song that Mr. Carter's predictive analytics could theoretically identify as a "hit," even if Mr. Carter's finished software functions as she claims. Ronk has a set of lyrics. And the press release cited does not suggest that TikTok is giving UMG access to individualized data, let alone so that UMG can unlawfully appropriate the songs of artists. *TikTok and Universal Music Group Announce Expanded Global Alliance*, UNIVERSAL MUSIC GROUP (February 8, 2021), http://universalmusic.com/tiktok-and-universal-music-group-announce-expanded-global-alliance. In other words, Ronk simply points to lawful business operations and then proclaims without substantiation that they are being used for nefarious purposes. *See Allstate*, 842 F. Supp. 2d at 1226.

15

law "to support a finding that there was a 'reasonable possibility' that [Defendants] accessed" *Upgraded 2.0. Weiss*, 2015 WL 12711658, at *5 (granting motion to dismiss because allegations that DreamWorks "'collaborated and schemed' to have a 'man in jeans and a black leather jacket' steal Plaintiff's flash drive" to help create the hit series, *Smash*, or that DreamWorks "could have obtained a copy of [her] script through" a celebrity rights organization with which plaintiff had previously worked, were "highly improbable"); *see, e.g.*, *Astor-White v. Strong*, 817 Fed. App'x 502, 503 (9th Cir. 2020) (affirming dismissal of plaintiff's complaint without leave to amend because "mere allegation" that three people plaintiff shared his work with "had a 'working relationship' with or moved in similar circles' as [defendant] does not establish that [defendant] had a reasonable opportunity or reasonable possibility of viewing the allegedly infringed work); *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. 2014) (plaintiff did "no more than suggest a bare possibility of access," by alleging a "media-savvy" film-maker could have accessed his work from a website); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 49 n.2 (2d Cir. 2003) ("reject[ing] as unsubstantiated [plaintiff's] theory of access via an alleged [] conspiracy," by which someone plaintiff "never met, spoke[] to or sent music to" "played a central role" in providing access to defendants).

Separately, even if Ronk could plausibly allege Facebook or anyone else provided the type of technological or user data access she alleges to UMG, the naked allegation that "Defendants used that to access Plaintiff Ronk's work," FAC ¶ 49, or "used the technology to infringe" *id.* ¶ 63, are "mere conclusion[s], devoid of facts to support an inference that [Defendants] directly accessed the song," and independently fatal to Ronk's claim. *Minaj*, 2012 WL 12887393, at *3 ("bald allegation that [defendant] 'took the content'" was a legal conclusion not accepted as true).

## 2.   Ronk's Other "Probative Evidence" Is Probative of Nothing.

Left with nothing else, Ronk finally resorts to her own armchair psychoanalysis of Perry to "prove" that it was "not possibl[e]" for Perry to write the uplifting lyrics in *Smile*. According to Ronk, Perry would have been *physically incapable* of writing the

16

"cheery" lyrics in *Smile* if she were truly suffering from depression, and therefore Perry either (1) lied about how depressed she was at the time and had to steal Ronk's lyrics to tell a genuine story of overcoming real depression, or (2) accurately disclosed her ongoing depression at the time, and therefore, was physically incapable of writing the lyrics and had to steal Ronk's lyrics to tell a genuine story of overcoming real depression. FAC ¶ 66. Ronk crosses the line by presuming to know how a "real" depression victim should act. *See Conder*, 2010 WL 2486765, at *2 (plaintiff cannot rely on "unwarranted deductions of fact, or unreasonable inferences").

Equally offensive, Ronk then assumes the role of religious gatekeeper, alleging it was *factually impossible* for someone like Perry who has "chosen to reject God," to include God in a lyric; per Ronk, as a lapsed Christian, Ms. Perry would only have written about the "Universe," so because *Smile* mentions God, the lyric must have come from Ronk. FAC ¶¶ 67, 78, Fig. D (8). Putting aside the farce of Ronk's speculation about the impact of Ms. Perry's faith on her songwriting, Ms. Perry is also not the only Defendant with a writing credit for *Smile*. So, *even if* any of Ronk's allegations were plausible or relevant, Ronk fails to explain why it could not be that one of the *other* songwriters on the team authored the particular lyric she challenges.

Finally, Ronk also continues to insist that access to *Upgraded 2.0* should be assumed because Perry has a "track record" of copying other artists' work. FAC ¶ 74. Of course, establishing a past propensity for copying (let alone infringement) is not a recognized way to prove access. *See Three Boys*, 212 F.3d at 482; *Weiss*, 2015 WL 12711658, at *4 ("Access may not be inferred through mere speculation or conjecture."). Moreover, no illicit "track record" exists. In one instance, Ronk agrees the artist received a songwriting credit on the allegedly infringing song. FAC ¶ 72. In the other instance, Ronk simply misunderstands what occurred. *Id.* ¶ 69. To be clear, Judge Snyder granted the defendants' renewed motion for judgment as a matter of law, holding that *no reasonable jury* could conclude that *Dark Horse* was substantially similar to the allegedly infringed work. *See Gray v. Perry*, No. 215CV05642CASJCX, 2020 WL 1275221, at *3-

1  4 (C.D. Cal. Mar. 16, 2020).

2      **B.    Ronk Does Not Plausibly Allege "Unlawful Appropriation" a.k.a.**

3              **"Substantial Similarity" Between *Smile* and *Upgraded 2.0***

4          Nor can Ronk ever prove actionable similarity. "Even where access is well-pled,"

5  to survive a motion to dismiss, "an infringement claim must [also] allege substantial

6  similarity between the rival works." *Minaj*, 2012 WL 12887393, at *3. Substantial

7  similarity can "often be decided as a matter of law." *Benay v. Warner Bros. Entm't, Inc.*,

8  607 F.3d 620, 624 (9th Cir. 2010), *overruled on other grounds, Skidmore,* 952 F.3d 1051,

9  because "there … [are] times where the court's 'judicial experience and common sense'

10 shows that the claims are not plausible and that a comparison of [the] two works creates

11 no more than a 'mere possibility of misconduct.'" *Masterson v. The Walt Disney Co.*, 821

12 Fed. App'x 779, 781 (9th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 679).

13         "[D]etermining whether works are substantially similar involves a two-part

14 analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883 F.3d

15 at 1118. "Only the extrinsic test's application may be decided as a matter of law … so

16 that is the only test relevant … [to] the district court's ruling on a motion to dismiss." *Id.*

17 Under the extrinsic test, "[t]he court must 'filter out' the unprotectable elements of the

18 plaintiff's work—primarily ideas and concepts, material in the public domain, and *scenes

19 à faire* (stock or standard features that are commonly associated with the treatment of a

20 given subject)." *Id.* A court must also filter out "ordinary phrases", which are "not

21 entitled to copyright protection. *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989).

22 Thereafter, the court "ask[s] only whether the protectible elements in [the] two works are

23 substantially similar," *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849

24 (9th Cir. 2012), *abrogated on other grounds as recognized in Unicolors, Inc. v. H&M

25 Hennes & Mauritz, L.P.*, 959 F.3d 1194 (9th Cir. 2020). Where review of the works

26 "exposes many more differences than similarities," and the similar "characteristics . . .

27 flow naturally from the works' shared basic plot premise," the works are "not sufficiently

28 similar to satisfy the extrinsic test." *Benay*, 607 F.3d at 625. Finally, courts disregard

ACTIVE55570827

"highly-abstracted" descriptions of shared ideas that are "so broad that [the description] is certain to sweep in almost every conceivable use of [the allegedly protected element]." *Carlini*, No. 2:19-cv-08306-SB-RAP, ECF No. 47, at 16.

Initially, Ronk now concedes that the list of the "same ideas" allegedly common to *Upgraded 2.0* and *Smile* in the twelve challenged lyrical snippets, are "unprotectible," and "as such Plaintiff does not claim copyright protection over [such] ideas." FAC ¶ 78. Accordingly, Defendants will not dwell on the point.[9] *See Benay*, 607 F.3d at 624 ("Copyright law only protects expression of ideas, not the ideas themselves"); *Rentmeester*, 883 F.3d at 1117 (there is no liability for "cop[ying] only the 'ideas' [and] 'concepts' used in [a] work").

### 1.    Random Shared Words Is Not Substantial Similarity.

Unable to abstract to the idea level, as Ronk concedes, Ronk points to seven isolated, ordinary words, divorced entirely from one another, that happen to appear somewhere in the lyrics to both *Upgraded 2.0* and *Smile*. But "[t]he test for copyright infringement requires more than shared usage of commonly-used words." *Woods v. Carter*, No. 15 C 9877, 2016 WL 640526, at *2 (N.D. Cal. Feb. 18, 2016). Moreover, "[o]rdinary phrases are not entitled to copyright protection." *Narell*, 872 F.2d at 911; *see also id.* ("Phrases and expression conveying an idea typically expressed in a limited number of stereotyped fashions are not subject to copyright protection."); *Corbello v. Valli*, 974 F.3d 965, 977 (9th Cir. 2020) ("The words 'social movement' thus form an unprotectable common phrase describing an idea."); *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004) (no substantial similarity where "the only similarities in dialogue between the two works come from the use of common, unprotectable poker jargon"); *Guity v. Santos*, No. 18-CV-10387 (PKC), 2019 WL 6619217, at *5 (S.D.N.Y. Dec. 5, 2019) ("[t]he shared usage of single everyday words also fails to show substantial similarity between the two songs"); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp.

---

[9] Although the FAC is not entirely clear about what lyrics allegedly support Ronk's claim of substantial similarity, Defendants will address all the lyrics in Figures D, F, G, and H.

2d 38, 47 n.5 (D.D.C. 1999) ("Most of the similarities alleged by [Plaintiff] are too patently frivolous for discussion. For instance, he asserts that the works are similar because both use the phrases 'kind of cute' and 'what the f—is this' and the words 'tool,' 'Jesus,' 'coup' and 'brother.' . . . Needless to say, the isolated use of a word or phrase such as 'kind of cute' is not copyrightable."). "2.0" is a commonplace word to describe an improved version of something with a "technological" or "modern" connotation. Its isolated, shared use by *Upgraded 2.0* and *Smile* is not evidence of *unlawful* appropriation, because "2.0" is not copyrightable.[10]

### 2.  "Synonyms" and "Shared Sememes" Are Not Protectable.

Ronk overreaches in newly asserting that *Smile* infringes *Upgraded 2.0* because the two songs have "synonymous words or synonymous phrases" and "Sememe[s]" of "Denotational 1 type" or "Connotational 3 type." *Id.* ¶¶ 78, Fig. D(1), (3), 81, Fig. G(2)-(3). Defendants will not dispute that there are *some* words or phrases Ronk compares that are arguably synonymous, for example, "dull" and "faded."[11] But even if *Upgraded 2.0* and *Smile* share a handful of synonyms, sharing a synonym is not indicative of unlawful appropriation, as use of a word does not establish copyright protection over all of its synonyms, *especially* in song lyrics, where the precise choice of words has "musical," in addition to "denotational" and "connotational" implications. There are reasons why a lyricist might want to use a particular word (for example, "remodel"), the most obvious being that it slant rhymes with "sparkled." But "remodel" might also use vowels that are easier to sing in a particular vocal range, or syllables that align better with a certain beat

---

[10] Nor are "not," "myself," "road,"  "tear / tears," "thank / thankful," or "rejected / rejection"—the only other words common to both songs. *See* ¶ 78, Fig. D(1-12).

[11] Others are *not* synonymous, such as Ronk's reference to "upgraded" (improved by addition or replacement of components; raised to a higher standard) versus Perry's "remodeled" (to change the structure or form of something, often a building). A remodel is not always better, often just different, unlike an upgrade. It is only Perry's subsequent contextual inclusion of "now I sparkle" that informs the listener she refers to a "positive" remodel. Thus, the *combination* of "2.0," "remodeled," and "now I sparkle" eventually expresses the idea of improvement in a *different* way than "upgraded 2.0."

*ACTIVE55570827*

("remodel" emphasizes the second syllable; "upgraded" emphasizes the first). More importantly, the use of a synonym is the *very definition of a different expression of the same idea*, even if one could construe it as having the "same meaning." *Benay*, 607 F.3d at 623. For the same reason courts consistently hold that artists cannot copyright an isolated word or phrase even when it is used by others *verbatim*, Ronk certainly cannot claim that all "connotat[ive]" or "denotat[ive]" synonyms "resulting in the exact same meaning" as "upgraded" (or anything else) are hers. FAC ¶ 81, Fig. G(1)-(4).[12]

### 3.      There Is No Substantial Similarity Alleged in the Selection, Coordination, or Arrangement of Elements.

Of course, even when individual elements are not protected, their "[o]riginal selection, coordination, and arrangement … may be." *L.A. Printex*, 676 F.3d at 849. Copyright protection extends to a combination of elements, however, only where "those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Skidmore*, 952 F.3d at 1074. "Put another way, [] a selection and arrangement copyright protects [] the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design." *Id.* at 1074 (emphasis in original). "Without [a particular, original] arrangement, there is no liability for taking 'ideas and concepts' from the plaintiff's work, 'even in combination.'" *Id.* at 1074 (quoting *Rentmeester*, 883 F.3d at 1122-23). As explained by the Honorable Learned Hand, the "selection and arrangement of elements must be similar enough that 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them.'" *Rentmeester*, 883 F.3d at 1121 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

Several of Ronk's examples of alleged "nearly identical" "selection and arrangement of the elements" are simply natural and inevitable consequences of English

---

[12] Ronk's exercise in "substituting" her lyrics into *Smile* has never been the test for substantial similarity and *at best* serves to establish that the scarce overlapping words are, in fact, synonymous or share "sememes." FAC ¶¶ 82-85.

grammatical structure or literary device. For example, Ronk believes the phrase "the old me faded . . . I've been reinstated" (from *Upgraded 2.0*) shares the same "selection and arrangement" as "used to be dull, now I sparkle" (from *Smile*). As an initial matter, Ronk surreptitiously omits by ellipses "my review is in," leaving a gaping hole in the middle of the complete *Upgraded 2.0* lyric to make it appear more similar to *Smile*.[13] *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1173 (C.D. Cal. 2016) (disapproving of plaintiff's "significantly misrepresent[ing] the works in multiple ways" in order to make the works appear more similar), *aff'd*, 713 Fed. App'x 626 (9th Cir. 2018); *Carlini*, No. 2:19-cv-08306-SB-RAP, ECF No. 47, at 16 & n.5 (criticizing the "libert[ies] Plaintiff took in comparing the two stories").[14] In any event, both phrases' "selection and arrangement" are merely the natural consequence of expressing the idea of improvement through juxtaposition, with the negative first, and the positive second. Other "selections and

---

[13] Notably, Ronk elsewhere claims the same omitted lyric from her song's chorus, "my review is in," is copied by the final line of *Smile*'s first verse, "Failed the test." FAC ¶ 78, Fig. D(9).

[14] Ronk "massages" other comparisons, such as alleging (1) *Upgraded 2.0*'s "deep" and *Smile*'s "long" "are synonyms" (FAC ¶ 78, Fig. D(3)); (2) *Upgraded 2.0*'s phrase "left with the third degree" "share[s] the same idea of 'I'm inspired to persevere'" as *Smile*'s "stayin alive like the BeeGees," when "left with the third degree" actually refers to a harsh questioning, (FAC ¶ 78, Fig. D(7)); and (3) *Upgraded 2.0*'s "keep[ing] tears in" and *Smile*'s "every tear has been a lesson" express the "same idea" of "learning from experiences that made me cry," even though the character in *Upgraded 2.0* does *not* cry. *Id.* ¶ 78, Fig. D(4). More subtle is when Ronk "tweaks" the allegedly common "idea" or "story element" itself, in response to Defendants' observation that the lyrics are not as similar as portrayed. (*Compare* Compl. ¶ 50(9) ("outcome of passing/failing a test") *with* FAC ¶ 78, Fig. D(9) ("outcome of an intangible/figurative test").) The previous "story element" has now morphed, presumably because the Defendants pointed out that *Upgraded 2.0*'s lyric "my review is in/in awe of how I'm rated" "uses the concrete metaphor of *passing* a job performance evaluation", and *Smile*'s lyric "failed the test" "refers to vaguely *failing* an intangible test." Doc. No. 27 at 25-26. Ronk's alleged "substantially similar" idea has now been abstracted even further to obscure the patent differences between the two sets of lyrics. *Carlini* at 16 (criticizing highly-abstracted shared idea because "[t]his description is so broad that it is certain to sweep in almost every conceivable use of [the allegedly protected element].").

22

arrangements" of the same words would be grammatically stilted or accomplish the wrong meaning: writing "now I sparkle, used to be dull" is backward-looking, rather than forward-looking; "dull [I] used to be, sparkle I [do] now" is grammatically awkward or dated. The selection and arrangement in both songs was inevitable—or at least the most artistically advantageous from a limited number of options, and therefore not protected. *Narell*, 872 F.2d at 911 ("Phrases and expressions conveying an idea typically expressed in a limited number of stereotyped fashions are not subject to copyright protection."); *see Carlini*, No. 2:19-cv-08306-SB-RAP, ECF No. 47, at 16.

More tellingly, Ronk cannot help but concede the selection and arrangement of some of the very elements on which she relies are *not* in fact the same, alleging instead they were "arranged … one after the other, **but just in swapped order**." FAC ¶ 81, Fig. G(1), (4). If it is not fatal to a selection and arrangement analysis that two elements are "just in swapped order," then a unique selection and arrangement means nothing. Taking a step back from Ronk's molecular, line-by-line analysis, and as is evident from the color-coded graphic Ronk relies upon to illustrate the songs' similarities, there is no correlation in how the allegedly similar elements appear in the two songs' overall structures. *Compare* FAC ¶ 78, Fig. E *with* Addendum C, attached hereto.

For example, while *Upgraded 2.0*'s chorus focuses on the character having been "upgraded (2.0)," Perry's reference to "2.0 Remodeled" appears only once—in *Smile*'s second verse. And while *Smile's* chorus focuses on the character's gratitude ("Yeah, I'm thankful, Scratch that, baby, I'm grateful"), Ronk's reference to gratitude, "Thank you! Amen!" appears only once—in *Upgraded 2.0*'s fourth verse. Whether a lyric is placed in a chorus, as compared to a verse, is of paramount importance in a song, as the chorus is where the primary musical and lyrical motifs are and what listeners tend to remember.

In sum, the passing similarities between *Upgraded 2.0* and *Smile* are so few and attenuated that the two works are not substantially similar as a matter of law. "Because many works … can be recast as compilations of individually unprotected constituent parts," to hold otherwise here "would deem substantially similar two vastly dissimilar

23

musical compositions … for sharing some of the same notes, words, or colors."
*Skidmore*, 952 F.3d at 1075-76.

### 4. The Two Songs Tell Different and Unique Stories

While Ronk attempts to plead the similarity based on shared abstract ideas and themes and coincidental use of common words, a comparison of the two sets of lyrics reveals patent dissimilarity in their stories. *Compare* Addendum A *with* Addendum B.

The theme of Ronk's *Upgraded 2.0* is one of "redemption from a sinful life through Jesus." In the lyrics, Ronk tells her autobiographical story of a woman who led a life "deep in sin" driven by her belief that the "only strength is by a man's lust" being redeemed and "upgraded (2.0)" by her belief in the "Shepard," Jesus Christ, and thus avoiding her friend Jenn's "sad end," declaring "Jesus, without you, it's me it could of [*sic*] been, Thank you! Amen!"[15] *See* Addendum A. By contrast, *Smile* makes no mention of the lust of another (or even sin in general), or Jenn, or Jesus, or a Shepard. Instead, it tells the story of a woman working her way through rejection and depression with an "ego check" and "no shortcuts" being "thankful" and "grateful" because she "finally got back that smile," "a Mona Lisa masterpiece." *See* Addendum B. These demonstrable differences in the "plot, themes, …, mood,… [and] characters," show as a matter of law that—even to the extent the two works express the same generic, unprotectible themes— they do so in completely different ways. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Amended Complaint be dismissed without leave to amend. Dismissal without leave to amend is proper when "[n]othing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar." *Rentmeester*, 883 F.3d

---

[15] *See* FAC ¶ 18 (*Upgraded 2.0* is "based on [Ronk's] own life experiences and close friendships" and tells "a heartfelt story of enduring a dark and hard beginning … and triumphantly and thankfully becoming a new person through the help of Jesus.")

at 1123; *Cameron*, 2020 WL 6118493, at *2 (lack of substantial similarity is a "defect that cannot be cured by amendment"). Ronk has not returned with different lyrics. No additional facts or discovery can cure the absence of substantial similarity as a matter of law, and thus amendment would be futile.

Dated:  March 8, 2021                        GREENBERG TRAURIG, LLP


                                         By:  */s/ Vincent H. Chieffo*
                                               Vincent H. Chieffo
                                               Attorneys for Defendants Katheryn Elizabeth
                                               Hudson p/k/a Katy Perry; Capitol Records, LLC;
                                               and Universal Music Group, LLC

25

ADDENDUM A

**Upgraded 2.0 Lyrics**

as alleged in ¶ 20, Fig. A of Plaintiff Michele Ronk's First Amended Complaint,
Doc. No. 65

Ever really looked deep down inside.

We feel like were in jeopardy

Left with major third degree

Like we were in a plane crash like Barker, feeling misplaced

The heartbreak that's faced

Things like being replaced

Never knowing how to trust

Only strength is by a mans lust

Without a guide along the way,slowly turning into rust

Some get through it but most will fall apart

Cause we need a good start

Dirty laundry piles up when someone's not doing their part

<Chorus>

I've been upgraded(2.0)

The old me faded

My review is in, I've been reinstated

In awe of how I'm rated

Cause I've been upgraded(2.0)

A Shepard to the defective

Restored on the shelf again, now disinfected

ADDENDUM A

Cause I messed up all over the place

Not knowing myself behind this face

My glass half empty living in fear of rejection


<chorus>


A road deep in sin until it all clicked

And I really understood God, I kicked

Off a new start, chatted with a friend

Licked my lips trying to keep tears in hearing about Jenn

It didn't have to be a story with a sad end, again

Jesus, without you, it's me it could of been,Thank You! Amen!


<chorus>


ADDENDUM A

ADDENDUM B

## <u>Smile Lyrics</u>

as alleged in ¶ 78, Fig. E. of Plaintiff Michele Ronk's First Amended Complaint, Doc. No. 65

Verse 1:

Every day

Groundhog Day

Going through motions felt so fake

Not myself

Not my best

Felt like I

Failed the test

But every tear has been a lesson

Rejection can be God's protection

Long hard road to get that redemption

But no shortcuts to a blessin'

Verse 2:

2.0

Remodeled

Used to be dull, now I sparkle

Had a piece

Of humble pie

ADDENDUM B

That ego check

Saved my life


Now I got a smile like Lionel Richie

Big and bright, need shades just to see me

Tryna stay alive just like I'm the Bee-Gees

A Mona Lisa masterpiece


Chorus:


Yeah, I'm thankful

Scratch that, baby, I'm grateful

Gotta say it's really been a while

But now I got back that smile, smile


I'm so thankful

Scratch that, baby, I'm grateful

Now you see me shine for a mile

Finally got back that smile, smile


ADDENDUM B

ADDENDUM C



Verse 1:

Ever really looked deep down Inside,
We feel like we're in jeopardy
Left with major third degree
Like we were in a plane crash like Barker, feeling misplaced
The heartbreak that's faced
Things like being replaced

Verse 2:

Never knowing how to trust
Only strength is by a man's lust
Without a guide along the way, slowly turning into rust
Some get through it but most will fall apart
Cause we need a good start
Dirty laundry piles up when someone's not doing their part

Verse 3:

A *Shepard* to the defective
Restored on the shelf again, now disinfected
Cause I messed up all over the place
Not knowing **myself** behind this face
My glass half empty, living in fear of **rejection**

Verse 4:

A **road** deep in sin until it all clicked,
And I really understood God, I kicked
Off a new start, chatted with a friend
Licked my lips trying to keep **tears** in hearing about Jean
It didn't have to be a story with a sad end, again
Jesus, without you, it's me it could of been, **Thank** You! Amen!

Chorus:

I've been *upgraded* (**2.0**)
*The old me faded*
My *review* is in, I've been reinstated
In awe of how I'm rated
Cause I've been upgraded (**2.0**)

Verse 1:

Every day
Groundhog Day
Going through motions felt so fake
Not **myself**
Not my best
Felt like I
Failed the *test*

But every **tear** has been a lesson
**Rejection** can be *God's* protection
Long hard **road** to get that redemption
But no shortcuts to a blessin'

Verse 2:

**2.0**
*Remodeled*
*Used to be dull*, now I sparkle
Had a piece
of humble pice
That ego check
Saved my life

Now I got a smile like Lionel Richie
Big and bright, need shades just to see me
Tryna stay alive just like I'm the Bee-Gees
A Mona Lisa masterpiece

Chorus:

Yeah, I'm, **thankful**
Scratch that, baby, I'm *grateful*
Gotta say it's really been a while
But now I got back that smile, smile

I'm so **thankful**
Scratch that, baby, I'm *grateful*
Now you see me shine for a mile
Finally got back that smile, smile

ADDENDUM C

Page 30